## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 14-40987-MSH |
| TELEXFREE, LLC *et al.*, | ) | Jointly Administered |
| | ) | |
| Debtors | ) | |
| | ) | |
| STEPHEN DARR, AS THE TRUSTEE OF | ) | |
| THE ESTATES OF TELEXFREE, LLC, | ) | |
| TELEXFREE, INC. AND TELEXFREE | ) | Adversary Proceeding |
| FINANCIAL, INC., | ) | No. 18-4091 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| DEPARTMENT OF THE TREASURY, | ) | |
| INTERNAL REVENUE SERVICE, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

### MEMORANDUM OF DECISION ON MOTIONS FOR SUMMARY JUDGMENT

Stephen Darr, the chapter 11 trustee of the estates of TelexFree, LLC, TelexFree, Inc., and

TelexFree Financial, Inc.,[1] filed a five-count complaint against the Internal Revenue Service

("IRS") seeking declaratory judgments in connection with disputes pertaining to TelexFree's 2012,

2013, and 2014 federal income tax returns. The IRS's response to the complaint included a

counterclaim seeking, in part, to recover more than $15 million that the IRS claims it disbursed to

the trustee in error after the trustee filed TelexFree's 2013 tax return.

---

[1] Unless otherwise noted, all references to "TelexFree" may refer to one or all of the debtors depending on the context. Precision in identification is not required for purposes of this memorandum.

The parties initially filed cross-motions for summary judgment on counts 4 and 5 of the complaint.  Pl.'s Mot. Summ. J., ECF No. 12; Def.'s Cross-mot. Partial Summ. J., ECF No. 21.  These counts concern whether the IRS's claims against TelexFree's estate are entitled to administrative expense treatment.  Subsequently, the IRS filed a separate motion for summary judgment on the remaining counts of the complaint (counts 1-3) and on its counterclaim.  Def.'s Second Mot. Partial Summ. J., ECF No. 55.  While the trustee did not cross-move for summary judgment on those claims, in his opposition to the IRS's motion he requested relief under Federal Rule of Civil Procedure 56(f) which gives the court discretion to grant summary judgment to a non-movant.

After considering the parties' briefs and statements of undisputed fact and the arguments of counsel at hearings on the motions, I now set forth my rulings and my reasoning.

## UNDISPUTED FACTS

1. *Background*

Beginning in 2012, TelexFree purported to be in the business of selling voice over internet protocol ("VoIP") international telephone subscription packages for a monthly fee.  Customers (the "Participants") who subscribed could download computer software and register their telephone numbers with TelexFree to make internet-based long-distance telephone calls.  But TelexFree wasn't what it appeared to be.  Sales of VoIP services generated only about 1% of TelexFree's revenue.  The other 99% came from membership subscriptions paid by the Participants.

Upon signing up, each Participant would receive one or more TelexFree user accounts.  Participants were promised financial incentives (referred to as "credits") which were deposited into their user accounts each time they recruited a new Participant, posted a daily internet

advertisement or sold a new membership plan.   Participants could access the TelexFree program in two ways.   Via a lower-tier investment, a Participant could pay TelexFree $339 and agree to post one TelexFree-related internet advertisement per day for a year.[2]   If she did so, then each week the Participant was entitled to a VoIP package from TelexFree.   The Participant could redeem the package for $20 in credits.   Thus, if a Participant posted an advertisement each day and redeemed the resulting credits for cash, she could earn $20 per week ($1,040 per year), a 207% return on her investment, plus additional amounts if she sold VoIP packages.   Or, a Participant could make a higher-tier investment by paying TelexFree $1,425 and agreeing to post five internet advertisements each day for a year.   If he did so, the Participant was entitled to five VoIP packages from TelexFree per week, which he could redeem for $100 in credits.   So, if a high-tier Participant posted five advertisements each day and redeemed the resulting credits for cash, he could collect $100 per week, or $5,200 per year, a 265% return on his investment.

Participants also could earn credits by recruiting other Participants into the TelexFree scheme.   For recruiting a new lower-tier Participant, one could earn $20 in credits.   Recruiting a new higher-tier Participant would generate $100 in credits.   At the same time, the Participant who had recruited the recruiter would receive additional money, hence the pyramid nature of the scheme.

Participants could exchange credits for cash, or they could use credits to purchase additional membership plans or VoIP packages. Membership plans or VoIP packages could be purchased in two ways: through a direct transaction when the Participant purchased the plan or

---

[2] The Participants' copying and pasting of TelexFree internet advertisements had no real value. As the United States Court of Appeals for the First Circuit explained in a related proceeding, "[t]o keep up the facade of a legitimate business, the company required participants to post commercially-useless internet advertisements." *Darr v. Dos Santos (In re TelexFree, LLC)*, 941 F.3d 576, 579-80 (1st Cir. 2019).

package from TelexFree and paid TelexFree directly or through a so-called "triangular transaction"

where a Participant purchased a plan or package through another Participant who in turn paid for

the purchase by instructing TelexFree to redeem accumulated credits in his user account.

As 2012 progressed, TelexFree's business evolved away from the sale of VoIP plans for

actual use into the recruiting of an ever-widening base of Participants on the promise of triple-

digit investment returns.   This was the pyramid scheme.   The money to pay those returns was

generated from the membership fees paid by lower level Participants.   This was the Ponzi

scheme.

> TelexFree was a hybrid Ponzi and pyramid scheme that operated in the United
> States from 2012 until 2014, when its founders were criminally charged, its
> operations closed, and it declared bankruptcy.   It is considered one of the largest
> such schemes in U.S. history, with approximately $1.7 billion lost and one million
> participants, many of them immigrants, defrauded.

*Darr v. Dos Santos (In re TelexFree, LLC)*, 941 F.3d 576, 579 (1st Cir. 2019).

On April 15, 2014, the Securities and Exchange Commission ("SEC") brought an action

against TelexFree and others in the United States District Court for the District of Massachusetts

asserting that TelexFree and its affiliates were engaged in an illegal Ponzi/pyramid scheme and in

the fraudulent and unregistered offering of securities.   At or around the same time, Homeland

Security Investigations seized TelexFree's assets, books, and records.

2.     *Bankruptcy and the Trustee's Appointment*

On April 13, 2014 (the "Petition Date"), two days before the SEC commenced its action,

TelexFree and its affiliates filed voluntary chapter 11 petitions in the United States Bankruptcy

Court for the District of Nevada. Shortly thereafter the cases were transferred to this Court.   Mr.

Darr was appointed chapter 11 trustee to administer all three bankruptcy estates on June 6, 2014.

Since the Petition Date TelexFree has generated no revenue.

3.      *2012 Tax Returns*

In September 2013, prior to the Petition Date, TelexFree filed its 2012 federal income tax return (the "2012 Original Return").   It reported net income of over $2 million with a tax due of $686,121 plus an estimated tax penalty due of $6,733, for a total amount owed of $692,854.   At the end of September 2013, the IRS issued an assessment for taxes and penalties against TelexFree totaling $885,105.24. TelexFree paid the assessment in full by mid-December.

In September 2016, the trustee filed an amended income tax return for TelexFree for the 2012 tax year (the "2012 Amended Return").   This return reported no tax due and requested a refund of the amount paid in 2013.   In October 2017, the IRS disallowed the trustee's refund claim on the basis that, among other things, TelexFree's advertising expenses were either not deductible as ordinary and necessary business expenses, or, to the extent they were credits owed to Participants, were not deductible because the amounts were not actually paid or likely to be paid.

In March 2018, the trustee filed a second amended return for 2012 (the "2012 Second Amended Return") reporting that TelexFree had no taxable income, owed no tax and was entitled to a refund.   Again, the deductions claimed included TelexFree's advertising expenses and credits owed to Participants.

4.      *2013 Tax Returns*

The due date for TelexFree to file its 2013 federal income tax return was March 17, 2014. On or about March 31, 2014, about two weeks before the Petition Date, without filing a return, TelexFree made a payment to the IRS in the amount of $15,792,982 to be applied to its anticipated 2013 federal income tax liability.

In September 2016, the trustee filed TelexFree's federal income tax return for 2013 (the "2013 Original Return"). It reported a taxable loss of $2,101,985,935 and sought a refund of

$15,858,111.  Included in the loss was a bad debt expense of $186,344,898 resulting from the write-off of a worthless debt owed to TelexFree by a related entity, Ympactus Comercial, Ltda. The trustee also claimed deductions based on amounts TelexFree owed to Participants as credits.

In December 2016, the IRS sent a refund check to the trustee in the amount of $15,532,440.39 for tax year 2013 (the "2013 Refund").[3]  The IRS contends that this check was sent in error.

In April 2017, the IRS issued four Notices of Proposed Adjustment ("NOPA"s) related to the 2013 Original Return.  The NOPAs: (a) disallowed claimed advertising expenses in the amount of $2,151,645,140; (b) disallowed claimed commission expenses of $622,588,035; (c) disallowed the claimed Ympactus bad debt write-off of $186,344,898; and (d) imposed a failure-to-file penalty of $75,126,857.

In March 2018, the trustee filed an amended federal income tax return for 2013 (the "2013 Amended Return") reporting a taxable loss of $3,143,851.

5.      *2014 Tax Returns*

In June 2017, the trustee filed TelexFree's federal income tax return for 2014 (the "2014 Original Return").  The return reported income of $161,550,353, deductions totaling $2,450,176,063, and a net loss of $2,288,625,710.  Nearly all (99.7%) of the claimed deductions consisted of credits issued to Participants.  On November 6, 2017, the IRS issued three NOPAs related to the 2014 Original Return proposing the following adjustments: (a) disallowing the claimed deduction for credits in the amount of $2,442,705,606; (b) imposing a failure-to-file

---

[3] This represented $15,477,122 of TelexFree's prepetition estimated tax payment plus statutory interest of $55,318.   The IRS retained $315,860 which it assessed as a "bad check penalty."

penalty in the amount of $13,481,991; and (c) disallowing a claimed net operating loss carry over deduction in the amount of $2,578,363,363.

On or about March 7, 2018, the trustee filed an amended return for 2014 (the "2014 Amended Return") in which TelexFree's reported total income was increased to $2,065,852,478, claimed deductions were increased to $2,601,446,626, resulting in a net loss of $535,594,148. The 2014 Amended Return claimed post-petition deductions including a $148 million casualty loss deduction related to the forfeiture of assets by a principal of TelexFree in connection with his criminal sentence.

6.    *The IRS's Claims*

In June 2017, the IRS filed a request for payment of administrative expenses in TelexFree's bankruptcy case for $15,532,440.39, the amount of the 2013 Refund. (Claim No. 2987-1).   A few days later, the IRS filed a prepetition proof of claim (Claim No. 2988) related to the 2013 Original Return (the "Prepetition Tax Claim").   This claim consists of a prepetition unsecured priority claim for taxes owed in the amount of $285,710,294.86 and a prepetition general unsecured claim for penalties in the amount of $71,188,566.60.   Then, in October 2017, the IRS issued a statutory notice of deficiency related to TelexFree's income tax liabilities for 2013 that determined a tax deficiency of $300,507,248.00 and a late-filing penalty of $75,126,857.00.

In November 2017, the IRS filed an amended request for payment of administrative expenses adding to its original administrative expense claim of $15,532,440.39, a claim for TelexFree's 2014 federal income tax liability in the amount of $53,927,964.00, resulting in a total administrative expense claim of $69,460,404.39 (Claim 2987-2) (the "Administrative Claim").

7.    *Voluntary Subordination of Claims*

About two weeks after the trustee filed the complaint commencing this action, the U.S.

Department of Justice ("DOJ") informed the trustee that under Tax Division Directive No. 137

DOJ had been authorized to subordinate the entire priority component of the IRS's Prepetition Tax

Claim ($285,710,294.86), as well as $52,593,821, which is most, but not all, of the Administrative

Claim related to 2014 income tax liability, to other allowed administrative expenses and the claims

of defrauded investors in the bankruptcy case.   DOJ informed the trustee that it had not been

authorized to subordinate the IRS's Administrative Claim for the 2013 Refund or $1,334,143 (plus

statutory interest and penalties) of the 2014 income tax liability.

## JURISDICTION

The Court has jurisdiction over this proceeding.   28 U.S.C. §§ 1334, 1346(c), 157.   This

is a core proceeding.   28 U.S.C. § 157(b)(2)(B), (C), (E).   Venue is proper.   28 U.S.C. §§ 1408,

1409.

## ANALYSIS

The Bankruptcy Code authorizes bankruptcy courts to decide certain tax-related disputes.

11 U.S.C. § 505(a)(1)[4] ("Except as provided in paragraph (2) of this subsection [inapplicable

here], the court may determine the amount or legality of any tax, any fine or penalty relating to a

tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether

or not contested before and adjudicated by a judicial or administrative tribunal of competent

jurisdiction."); *see also Horton v. O'Cheskey (In re Am. Hous. Found.)*, Civil Action No. 2:12-

CV-020-C, 2012 U.S. Dist. LEXIS 190483, at *3 (N.D. Tex. Sept. 14, 2012) ("Section 505 of the

---

[4] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11
U.S.C. §§ 101-1532.

Bankruptcy Code grants bankruptcy courts jurisdiction to determine the tax liabilities of debtors and their estates . . . .").  In this proceeding, I must determine the amount, if any, of the IRS's Administrative Claim and its Prepetition Tax Claim.

1.    *The Summary Judgment Standard*

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), made applicable hereto by Fed. R. Bankr. P. 7056.  A genuine issue is "one supported by such evidence that 'a reasonable jury, drawing favorable inferences,' could resolve [] in favor of the nonmoving party."  *Stewart Title Guar. Co. v. McCarthy (In re McCarthy)*, 473 B.R. 485, 491 (Bankr. D. Mass. 2012) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).  A fact is "material" if it potentially could affect the suit's outcome under applicable law.  *Id.* at 491.  "'The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (quoting Fed. R. Civ. P. 56 advisory committee's note).

The party seeking summary judgment bears the initial burden to demonstrate that no genuine dispute of material fact exists by identifying evidence in the record that is so one-sided or deficient that a judgment as a matter of law in that party's favor is unavoidable.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 256-57 (1986).  "Only if the record, viewed in that manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment."  *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997); *see also Anderson* at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

When parties file cross-motions for summary judgment, as is the case here with respect to counts 4 and 5 of the trustee's complaint, "the court must 'employ the same standard of review, but view each motion separately, drawing all inferences in favor of the nonmoving party.'" *Muir v. Town of Stockbridge*, Civil No. 14-30092-MGM, 2016 U.S. Dist. LEXIS 45436, at *3 (D. Mass. Apr. 4, 2016) (quoting *Fadili v. Deutsche Bank Nat'l Trust Co.*, 772 F.3d 951, 953 (1st Cir. 2014)). Here, the material facts underlying counts 4 and 5 are not in dispute. Rather, the parties disagree on how the law applies to those facts.

2.      *Counts 4 and 5 of the Complaint*

In count 4 of his complaint, the trustee seeks a declaratory judgment that any liability of the TelexFree bankruptcy estate to the IRS stemming from the 2013 Refund should be deemed a prepetition priority unsecured claim under Bankruptcy Code § 507(a)(8), not a post-petition administrative expense claim as the IRS asserts. In count 5, he seeks a declaratory judgment that the IRS's claim for tax year 2014 is not entitled to either priority or administrative expense treatment but is rather a garden variety prepetition general unsecured claim.

A.      *Relevant Bankruptcy Code Provisions*

Several Code provisions pertain to the IRS's claims asserted in the bankruptcy case. First, with respect to administrative expenses incurred during a bankruptcy case, § 503(b) provides, in pertinent part: "After notice and a hearing, there shall be allowed, administrative expenses . . . including . . . any tax . . . incurred by the estate . . ., except a tax of a kind specified in section 507(a)(8) of this title[.]" 11 U.S.C. § 503(b)(1)(B)(i). Second, as to the treatment of certain tax claims incurred prepetition, § 507(a)(8) assigns eighth priority status to, among other claims:

> allowed unsecured claims of governmental units . . . to the extent that such
> claims are for . . . a tax on or measured by income or gross receipts for a taxable
> year ending on or before the date of the filing of the petition . . . for which a
> return, if required, is last due, including extension, after three years before the
> date of the filing of the petition[.]

11 U.S.C. § 507(a)(8)(A)(i).   Next, § 507(c) applies to a governmental unit's erroneous tax refund

claim: "For the purpose of subsection (a) of this section, a claim of a governmental unit arising

from an erroneous refund or credit of a tax has the same priority as a claim for the tax to which

such refund or credit relates."   11 U.S.C. § 507(c).   Finally, a tax-related claim that fits within

none of the foregoing—*i.e.*, a claim that is not entitled to either administrative expense or priority

treatment—is treated as a prepetition general unsecured claim.   *See In re Affirmative Ins.*

*Holdings,* 607 B.R. 175, 175-88 (Bankr. D. Del. 2019).

B.      *The 2013 Refund*

The trustee argues that the 2013 Refund claim falls squarely under § 507(c) and as such

the claim has the same priority as the tax to which it relates, making it an eighth priority unsecured

claim under § 507(a)(8).   The IRS disagrees.   It asserts that it is not a creditor as defined in

§ 101(10) with respect to the 2013 Refund because TelexFree did not owe the IRS any money

related to the 2013 tax year as of the Petition Date.   Thus, its request for return of the 2013 Refund

is not a claim as specified in § 507(c).   In essence, the IRS maintains that § 507(c) applies only to

refunds paid in error prepetition.   Further, the IRS argues, it is entitled to the return of the 2013

Refund as an improper post-petition transfer to which the estate was not entitled based on the

equitable theory of unjust enrichment.   Stated differently, the IRS insists that the erroneous

payment resulted in a post-petition debt that the trustee incurred as an obligation of TelexFree's

bankruptcy estate, making it a classic expense of administration.

Administrative expenses allowable under § 503(b) enjoy second priority in the hierarchy

of obligations entitled to payment from assets of the bankruptcy estate, behind only domestic

support obligations.   11 U.S.C. § 507(a)(2).   As a result, "[t]he traditional presumption favoring ratable distribution among all holders of unsecured claims counsels strict construction of the Bankruptcy Code provisions governing requests for priority payment of administrative expenses." *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 4-5 (1st Cir. 1992). Because the IRS seeks administrative expense status for the 2013 Refund claim, it bears the burdens of proof and persuasion.   *Id*. at 5 ("The burden of proving entitlement to priority payment as an administrative expense therefore rests with the party requesting it."); *see also In re Affirmative Ins. Holdings,* 607 B.R. at 179-80 ("As the IRS is seeking an administrative expense priority claim, the IRS bears the burden of proof and persuasion.").

The IRS offers no legal authority in support of its reading of the statute as applying only to prepetition erroneous refunds.   The plain language of § 507(c) does not distinguish between erroneous tax refund payments made prepetition and post-petition.   *See also In re Motor Freight Express*, No. 82-04944S, 1988 Bankr. LEXIS 2608, at *6-7 (Bankr. E.D. Penn. May 11, 1988) (interpreting prior but consistent version of § 507(c) and stating that it applies to an erroneous tax refund claim "irrespective of when the error is discovered or the 'erroneous payment' is made").

As for its assertion that its claim to recover the 2013 Refund is based on an equitable claim for unjust enrichment, the authority the IRS relies on to support this argument is off point.   Several decisions it cites do not discuss § 507(c) at all.   *See, e.g.*, *Clark v. United States*, 63 F.3d 83 (1st Cir. 1995) (not a bankruptcy case, thereby rendering the Code, and specifically § 507(c), inapplicable); *United States v. Reagan*, 651 F. Supp. 387 (D. Mass. 1987) (same); *United States v. Bell*, 818 F. Supp. 444 (D. Mass. 1993) (same); *United States v. McRee*, 7 F.3d 976 (11th Cir. 1993) (same); *Winters v. Shulman (In re Winters)*, 485 B.R. 375 (Bankr. M.D. Tenn.) (bankruptcy case decided without reference to § 507(c)), *rev'd and remanded on other grounds*, 503 B.R. 434

(B.A.P. 6th Cir. 2013); *Brown v. Lindsey (In re Lindsey)*, Ch. 7 Case No. 05-96622, Adv. No. 07-1332, 2009 WL 1608526 (Bankr. N.D. Ohio Jan. 28, 2009) (same).

The other decisions the IRS cites are distinguishable on their facts.   In *McCarthy v. IRS (In re Naeem)*, 515 B.R. 297 (Bankr. E.D. Va. 2014), after the chapter 7 trustee filed a tax return on the estate's behalf which provided for a tax refund, the IRS mistakenly sent the refund to the debtors rather than to the trustee.   The trustee tried to get the money from the debtors but they had spent it.   He then sued the IRS in the bankruptcy court and obtained a judgment requiring the IRS to refund the amount to him, which it did.   Having now paid twice, the IRS filed a proof of claim in the bankruptcy case based on the first refund's being an erroneous refund under § 507(c).   The bankruptcy court disallowed the IRS's claim finding that "[t]he refund was not erroneous; the delivery of the refund was.   If the IRS had sent the refund check to the trustee, no one would content [sic] that it was an erroneous refund." *Naeem*, 515 B.R. at 298.   The court concluded that the IRS's remedy was "to recover the money from the debtor who was unjustly enriched by it." *Id.* at 299.   *Naeem,* while fascinating, sheds no light on the application of § 507(c) to the facts here.   This is not a case where the IRS paid the refund twice so that, as in *Naeem*, it would have an unjust enrichment claim for the second refund.   This case involves a classic erroneous refund.

*United States v. Frontone*, 383 F.3d 656 (7th Cir. 2004), relied upon by the IRS, concerned the dischargeability of a tax claim, not the claim's priority or status as an administrative expense. The Seventh Circuit Court of Appeals discussed § 507(c), but only in dicta.   The excerpt from the circuit court's opinion that the IRS relies upon in support of its argument here is the following hypothetical:

> Suppose the Frontones had no income and therefore paid no income taxes, but the IRS made a mistake and mailed them a check.   The government would be entitled

13

> to the return of the money, but not because the Frontones owed it any taxes. The
> ground would be unjust enrichment, since the Frontones would have no right to
> retain money paid them by mistake.

*Frontone*, 383 F.3d at 660. The Seventh Circuit's hypothetical scenario bears no relationship to

what happened in this case. TelexFree did have income. It did pay income taxes. Its

bankruptcy estate did file a tax return and sought a refund of the amount TelexFree had paid in

taxes. The IRS sent a check as a result of the filed tax return. Indeed, the Seventh Circuit

recognized that, in general, "a claim for taxes based on an erroneous refund is—a claim for taxes."

*Id*. at 658. That's precisely the situation here.

Finally, the IRS references *United States v. Campbell (In re Campbell)*, Ch. 7 Case No. 87

B 6407 C, Adv. No. 90-1290 CEM, 1990 Bankr. LEXIS 2922 (Bankr. D. Colo. Dec. 6, 1990). In

that case, before filing a chapter 7 petition, the debtor paid an assessed tax. The IRS mistakenly

credited the debtor's account twice for that single payment and then sent the debtor a check post-

petition for what it believed was a refund of an overpayment. The debtor turned the check over

to his bankruptcy trustee. Upon realizing its error, the IRS initiated an adversary proceeding

against the debtor and the trustee in the bankruptcy court to recover the payment as an erroneous

refund. The trustee moved to dismiss the complaint, contending that § 507(c) applied and the IRS

should be treated as a creditor with a priority prepetition claim. The bankruptcy court denied the

trustee's motion, concluding that, under the circumstances, the IRS's claim wasn't an erroneous

refund claim; rather it was a claim by the IRS to recover its own money. "The IRS paid the debtor

its money in error. . . . [T]he debtor did not owe the government money. The United States had

no claim against the debtor. The money that it, for lack of a better term 'refunded' to the debtor

was its money." *Id*. at *4-5. Those are not the facts here. The IRS paid the 2013 Refund once,

after receiving the 2013 Original Return which claimed the refund.

I conclude that the IRS's post-petition erroneous refund related to its prepetition tax claim and is not an administrative expense claim owed by the TelexFree bankruptcy estate.   Instead, it is a claim that falls squarely under § 507(c).   The IRS—an agency of the United States and hence a governmental unit under § 101(27)—paid the trustee by mistake $15,532,440.39 after the trustee filed the 2013 Original Return requesting a refund of estimated taxes paid prepetition.   The payment relates to the 2013 tax year which was entirely prepetition.   Thus, the IRS holds a prepetition, priority unsecured claim under § 507(a)(8) for the 2013 Refund.   The trustee is entitled to a declaratory judgment as to this claim, and thus his motion for summary judgment as to count 4 will be granted and the IRS's cross-motion as to count 4 will be denied.

C.      *The 2014 Income Tax Liability*

Section 503(b)(1)(B)(i) provides that "any tax . . . incurred by the estate, . . . except a tax of a kind specified" in § 507(a)(8), is an expense of administration.   In turn, § 507(a)(8) identifies certain taxes that are entitled to priority (but not administrative expense) status, including taxes "on or measured by income or gross receipts for a taxable year ending on or before" the petition date.   11 U.S.C. § 507(a)(8)(A).   TelexFree and its affiliates filed their bankruptcy petitions in April of 2014 and so their 2014 tax year straddles the Petition Date, with a portion on the prepetition side and a portion on the post-petition side.   Thus, as the IRS correctly notes, because the 2014 tax year did not end "on or before" the Petition Date, the IRS's claim relating to 2014 taxes is not entitled to priority status under § 507(a)(8)(A).[5]   The question remains, is it entitled

---

[5] The current version of § 507(a)(8)(A) was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").   The pre-BAPCPA version contained language that arguably permitted giving some or all straddle-year taxes priority treatment.   *See Towers for Pacific-Atlantic Trading Co. v. United States (In re Pacific-Atlantic Trading Co.)*, 64 F.3d 1292, 1301-04 (9th Cir. 1995).   The amendment confers eighth priority treatment *only* to taxes for a taxable year ending on or before the bankruptcy petition date, thereby ending any debate that straddle-year taxes may qualify for § 507(a)(8)(A) priority.   As will be discussed below, some have inferred from the amendment that since straddle-year taxes no longer qualify for

to administrative expense treatment under § 503(b)(1)(B)(i)?

The IRS argues that, because the 2014 tax year ended after the Petition Date, at which point the trustee prepared and filed the tax return for that year, the TelexFree estate should be deemed to have incurred the entire 2014 income tax obligation making the IRS's claim for the 2014 income taxes owed an administrative expense claim under § 503(b)(1)(B)(i).   To add heft to its argument, the IRS notes that in the 2014 return the trustee reported deductions for post-petition expenses thereby making the post-petition period integral to any characterization of the 2014 tax liabilities.

The trustee counters that the 2014 tax liability was not "incurred by the estate" because all income giving rise to the tax liability was earned by TelexFree prior to the Petition Date.   And since straddle-year taxes do not by definition qualify for § 507(a)(8)(A) eighth priority treatment, the trustee argues that the IRS's claim for 2014 taxes is simply a prepetition non-priority general unsecured claim.

The Bankruptcy Code, despite its panoply of provisions classifying all manner of tax claims, offers no precise statutory hole in which to slide the peg of straddle-year taxes.   Getting the peg to fit will require some sculpting.   A survey of relevant case authority will provide valuable guidance and perspective.

In *In re FR & S Corp.*, Ch. 7 Case No. 08-08659 (ESL), 2011 Bankr. LEXIS 1307 (Bankr. D.P.R. March 30, 2011), the debtor, a calendar-year taxpayer, filed its bankruptcy petition in December 2008.   Its Puerto Rico tax payment for the 2008 tax year was due in April 2009.   The Commonwealth of Puerto Rico Treasury Department claimed the entire tax liability was a post-petition expense of administration.   The chapter 7 trustee objected, arguing that because all taxable activity had occurred prepetition the bankruptcy estate had incurred no tax and, thus, the

---

§ 507(a)(8)(A) priority they must be accorded administrative expense status.

16

Commonwealth did not have an administrative expense claim.

In his analysis, Judge Lamoutte began by ruling that the Commonwealth did not have a priority claim under § 507(a)(8)(A) because its claim was not for a tax with respect to a taxable year ending on or before the petition date.   He then turned to local tax law, specifically the Puerto Rico Internal Revenue Code of 1994, to determine whether the Commonwealth's tax claim might qualify for administrative expense status under § 503(b)(1)(B)(i).   Under that law, he found, the claim was incurred when it accrued on the last day of the 2008 tax year which was post-petition. Thus, he held that the bankruptcy estate had incurred the tax liability and that the Commonwealth was entitled to an administrative expense claim under § 503(b).   In so ruling, the court noted that "[t]he 2005 BAPCPA amendments to Section 507(a)(8)(A) provide that income taxes for the straddle year are entirely post-petition administrative expenses." *FR & S Corp.*, 2011 Bankr. LEXIS 1307, at *16 (citing Alan N. Resnick & Henry J. Sommer, 15 Collier on Bankruptcy ¶ TX 1.05[5][a] (15th ed. rev. 2010)).

In *In re Earl Gaudio & Son, Inc.*, Ch. 11 Case No. 13-90942, 2017 Bankr. LEXIS 207 (Bankr. C.D. Ill. Jan. 25, 2017), the debtor, a calendar-year taxpayer, filed a chapter 11 petition in July 2013.   The Illinois Department of Revenue ("IDOR") claimed that the corporate debtor's straddle-year 2013 state business income tax liability under the Illinois Income Tax Act was entitled to administrative expense treatment under Code § 503(b)(1)(B)(i).   The debtor responded that the estate had not incurred the 2013 business income taxes and, thus, the IDOR did not have an administrative expense claim.   As in *FR & S Corp.*, the Illinois bankruptcy court in *Earl Gaudio* began its analysis by considering whether the IDOR's claim could be eligible for priority treatment under § 507(a)(8)(A).   Because the tax year in question had not ended on or before the petition date, the court concluded the answer was no.   As for the claim's status as an

administrative expense, the court explained that "[s]tate law determines the date that a tax is

incurred" and "[t]he provisions of the Illinois Income Tax Act, when read together, provide that

business income tax is incurred no earlier than the end of the taxable year, when liability is accrued

and fixed or inescapably imposed." *Earl Gaudio,* 2017 Bankr. LEXIS 207, at *7, *8.   In

rejecting the debtor's argument, the court noted:

> The Debtor seems to conflate the concept of "taxable event" with "tax liability."
> Most taxpayers have numerous taxable events occur during the course of any tax
> period.   Every receipt of potentially taxable income, whether from wages, interest,
> dividends, rent, or asset sales, may be a taxable event.   But a taxpayer's liability to
> pay a particular amount of taxes is generally calculated only at the end of a tax
> period, when all taxable events occurring during the period and when all deductions
> and credits that may be available to offset otherwise payable taxes are known.   The
> occurrence of a taxable event is only one factor in calculating an entity's tax
> liability for a particular tax period and the date of such event is not the date when
> tax liability is fixed or inescapably imposed.

*Id.* at *9-10.   As a result, the court concluded that the bankruptcy estate incurred the tax liability

post-petition and that the IDOR's claim for that liability was an expense of administration under

§ 503(b)(1)(B)(i).

The most recent decision dealing with straddle-year tax liability is *Affirmative Ins.*

*Holdings*, 607 B.R. 175.   The debtor and its affiliates filed chapter 11 bankruptcy petitions in

October 2015.   In March 2016, after the case was converted to one under chapter 7, the IRS filed

an administrative expense claim related to the debtors' 2015 income tax liability.   The trustee

objected, contending that the IRS's tax claim was not entitled to administrative expense treatment

because all taxable events had occurred prior to the bankruptcy filing: "by the time the Debtors'

cases were commenced, the Debtors were little more than shells with no material operational assets

and no meaningful source of revenue." *Affirmative Ins. Holdings*, 607 B.R. at 177.   As in *FR &*

*S Corp.* and *Earl Gaudio*, the Delaware bankruptcy court first determined that the IRS's claim was

not entitled to priority under § 507(a)(8) because the 2015 tax year did not end on or before the

18

petition date.    The court then parted company with *FR & S Corp.* and *Earl Gaudio* as to whether

the straddle-year tax debt qualified for administrative expense status.

The *Affirmative* court analyzed pre-BAPCPA decisions dealing with when a tax debt is

"incurred by the estate" for purposes of § 503(b)(1)(B)(i).    The court first cited a Third Circuit

Court of Appeals ruling for the proposition that "a tax liability is generally 'incurred' on the date

it accrues and not on the date of the assessment or the date on which it is payable."    *Id.* at 183

(citing *In re Columbia Gas Trans. Corp.*, 37 F.3d 982, 985 (3rd Cir. 1994)).    The court then

invoked a Florida bankruptcy court's decision for the proposition that "'[t]o the extent that income

was not earned by the estate during part of the tax year, but instead earned by the pre-petition

debtor, the tax was not incurred by the estate and was not entitled to administrative expense

[status].'"    *Id.* (quoting *In re Hillsborough Holdings Corp.*, 156 B.R. 318, 320 (Bankr. M.D. Fla.

1993), *aff'd*, 116 F.3d 1391 (11th Cir. 1997)).    Next, the *Affirmative* court analyzed a case in

which a state had filed a proof of claim that covered "the pre-petition period of a tax year which

terminated post-petition" and sought administrative expense treatment, *In re O.P.M. Leasing*

*Services, Inc.*, 68 B.R. 979, 981 (Bankr. S.D.N.Y. 1987).    The *Affirmative* court summarized the

*O.P.M.* decision as follows:

> In *Matter of O.P.M. Leasing Services, Inc.*, the bankruptcy court was faced with
> the exact issue, albeit prior to BAPCPA, wherein the filed proof of claim for the
> pre-petition portion of a corporate income tax could not be precisely determined
> until the end of the debtor's fiscal year, terminating post-petition.    The Court held:
> "[n]onetheless, as the claim at issue consists of taxes allocable to business activities
> during the pre-petition period, that claim is not entitled to an administrative expense
> priority."    The Court explained that the legislative history of then § 503(b)(1)(B)
> limited the administrative expense to "income earned by the estate during the case."
> The *O.P.M. Leasing* [court] continued that to the extent "income is not earned by
> the estate during the case, but is instead earned by the pre-petition debtor, any tax
> liability on that income is not entitled to an administrative expense priority."

*Affirmative Ins. Holdings*, 607 B.R. at 183-84 (footnotes omitted) (quoting *O.P.M.*, 68 B.R. at 983-

84).    The court in *Affirmative*, while acknowledging that *Columbia Gas*, *Hillsborough Holdings*,

and *O.P.M.* all were decided pre-BAPCPA, nevertheless found them authoritative.   The court was

unwilling to take the inferential leap to reach the conclusion that, by revising § 507(a)(8)(A) to

exclude straddle-year taxes from eighth priority treatment, BAPCPA conferred on them

§ 503(b)(1)(B)(i) administrative expense status.   It invoked the Supreme Court's oft-cited

admonition that, when amending the bankruptcy laws, Congress

> "does not write 'on a clean slate' . . . [and thus the Supreme Court] has been
> reluctant to accept arguments that would interpret the Code . . . to effect a major
> change in pre-Code practice that is not the subject of at least some discussion in the
> legislative history."

*Id.* at 184 (quoting *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992)).

The bankruptcy court in *Affirmative* also found support by comparing the text of subparts

(i) and (ii) of § 503(b)(1)(B) which provide that "[a]fter notice and a hearing, there shall be

allowed, administrative expenses, . . . including":

> (B) any tax—
>
> (i) incurred by the estate, whether secured or unsecured, including property
> taxes for which liability is in rem, in personam, or both, except a tax of a kind
> specified in section 507(a)(8) of this title; or
>
> (ii) attributable to an excessive allowance of a tentative carryback adjustment
> that the estate received, *whether the taxable year to which such adjustment relates
> ended before or after the commencement of the case*[.]

11 U.S.C. § 503(b)(1)(B) (emphasis added).   The court concluded that if Congress had "desired

to grant administrative expense priority to *all* straddle year taxes, it could have done so by using

[in § 503(b)(1)(B)(i)] the language similar to that set forth in section 503(b)(1)(B)(ii)."

*Affirmative Ins. Holdings*, 607 B.R. at 185.

Finally, the *Affirmative* court addressed the two prior reported post-BAPCPA straddle-year

decisions, *FR & S Corp.* and *Earl Gaudio*.   The court disagreed with the *Earl Gaudio* court's

privileging tax liability over taxable events.   The court concluded that taxable events should

govern because in the context of classifying tax claims a bankruptcy court is "not determining the

**amount** of taxes due (or as the *In re Earl Gaudio & Son, Inc.* court refers to the "taxpayer liability")
– it is examining the **priority** based on whether the tax was incurred, administrative priority or
general unsecured as the case may be." *Id.* at 186.   Quoting a decision of the U.S. Court of
Appeals for the Eighth Circuit, the *Affirmative* court continued:

> "[s]imply stated, the tax is being imposed against the single corporate entity in
> keeping with [the Bankruptcy Code] . . ., but the payment of the tax imposed is
> being divided into separate components in accordance with the bankruptcy laws
> determining the priority of payment of those claims.   Thus, there is nothing in
> either the bankruptcy or tax laws which prevents us from allowing different
> treatment during distribution for different portions of . . . claims in this case."

*Id.* (alterations in original) (quoting *In re L.J. O'Neill Shoe Co.*, 64 F.3d 1146, 1152 (8th Cir.
1995)).   As for *FR & S Corp.*, the *Affirmative* court disagreed with its holding that the BAPCPA
amendments abrogated prior wisdom and case precedent by transforming straddle-year tax claims
into entirely post-petition administrative expenses.   *Id.* at 186-87.   The court noted that it "could
not find any legislative history or statutory language allowing for the Straddle Tax Year to be an
administrative claim.   In fact, although Congress could have expressly written such, it did not."
*Id.* at 187.

After explaining why it would not follow the *Earl Gaudio* and *FR & S Corp.* decisions, the
*Affirmative* court concluded:

> Administrative expense priority should only be given to obligations that resulted in
> or arose out of a benefit received after the bankruptcy estate came into being . . .
> unless Congress gives specific instructions otherwise.   The Court appreciates that
> this result may cause an administrative burden on the debtors and the IRS to
> properly parse out pre- and post- petition events; however, the Court cannot read
> language into the Code or guess Congressional intent.   The plain-meaning [sic] of
> the statute indicates that although the amount or liability may be decided at the
> conclusion of the tax year; the administrative priority of that liability must turn on
> whether the estate incurred the claim.   As such, the Court holds that pre-petition
> events that incur tax liability during Straddle Tax Years are afforded general
> unsecured status whereas, post-petition events that incur tax liability during those
> same Straddle Tax Years are afforded administrative priority – in effect, bifurcating
> the straddle tax years into two distinct treatments under the Bankruptcy Code.

*Id*. at 188 (alteration, footnote, and quotation marks omitted).   The court sustained the trustee's objection to the administrative expense claim and gave the IRS time to amend its claim to specify whether any tax liability was allocable to post-petition taxable events.

I believe the *Affirmative* court got it right and that the amendment of § 503(b)(1)(B) by BAPCPA has nothing to do with determining whether a straddle-year tax is an expense of administration.   Nothing in the text of the statute says so, nor does the legislative history suggest such a major about-face in pre-BAPCPA practice.   Those who toil in the field of bankruptcy law know quite well that achieving administrative expense status, while a creditor's holy grail, can be a debtor's curse.   Creating an entirely new category of administrative expense claim should require a far sturdier reed for support than a combination of ambiguity and inference.

This court previously has explained that "[a]lthough the term 'incurred' is not defined by the Bankruptcy Code, the clear weight of authority holds that federal income taxes are incurred at the time they accrue as opposed to the time payment is due for section 503(b)(1)(B) purposes." *In re Johnson*, 190 B.R. 724, 727 (Bankr. D. Mass. 1995).   As applied here, because all of TelexFree's 2014 income accrued pre-petition, the tax on that income was incurred pre-petition and was not "incurred by the estate" under § 503(b)(1)(B).

The IRS correctly notes that the TelexFree estate claimed certain post-petition expenses as tax deductions in its 2014 tax return.   The IRS says these deductions were integral to determining TelexFree's 2014 tax liability and, since they accrued post-petition, the tax liability should be accorded administrative expense status.   As the *Affirmative* opinion explains, however, the issue presented with respect to a straddle-year tax claim concerns the priority of the claim, not its amount.   The focal point is when an event occurred that led TelexFree to accrue income tax liability.   Simply put, for income tax purposes, a taxable event occurs when the taxpayer generates

income. Federal income tax liability does not accrue when an expense is generated that is later claimed as a deduction. *See, e.g.*, *Maines v. Comm'r*, 144 T.C. 123, 134 (2015) (citing *Randall v. Loftsgaarden*, 478 U.S. 647, 657 (1986)) ("Receipt of tax deductions or credits that just reduce the amount of tax a taxpayer would otherwise owe is not itself a taxable event, 'for the investor has received no money or other "income" within the meaning of the Internal Revenue Code.'").

I conclude that the IRS's claim based on TelexFree's 2014 income tax liability is not an administrative expense of TelexFree's bankruptcy estate. It is, rather, a non-priority general unsecured claim.[6] The trustee's motion for summary judgment as to count 5 will be granted and the IRS's cross-motion will be denied.

3.      *Counts 1, 2, and 3 of the Complaint*

Counts 1, 2, and 3 of the trustee's complaint concern whether TelexFree properly claimed certain deductions in its 2012, 2013, and 2014 tax returns. In count 1, the trustee seeks a declaratory judgment that the deductions TelexFree took for the credits issued to Participants were "ordinary and necessary expenses" that were deductible under 26 U.S.C. § 162. In count 2, the trustee seeks a declaratory judgment that, because TelexFree properly took deductions for the credits in its 2013 returns, the 2013 Refund was not an erroneous refund at all and, thus, the IRS has no claim for those funds. Furthermore, alleges the trustee, the estate should receive a tax refund in the amount of $886,700 for 2012 (based on similar deductions). In count 3, the trustee seeks a declaratory judgment that, because the TelexFree credits properly were taken as deductions, the

---

[6] This is not a radical result. IRS claims receive non-priority general unsecured treatment in other circumstances when they are not entitled to priority treatment under § 507(a)(8). *See, e.g.*, *In re Evoli*, 258 B.R. 839, 844 (Bankr. M.D. Fla. 2001) ("Section 507(a)(8)(A)(i) of the Bankruptcy Code provides that an income tax is entitled to priority status if the return was due 'after three years before the date of the filing of the petition.' 11 U.S.C. § 507(a)(8)(A)(i). The section 'limits the priority status to more recent, but unpaid taxes, and denies priority status to so-called "stale" tax claims.' *In re Richards*, 994 F.2d [763, 765 (10th Cir. 1993)].").

IRS's Prepetition Tax Claim and the portion of its Administrative Claim relating to 2014 taxes should be disallowed.   In sum, all three counts concern TelexFree's entitlement to take certain deductions.

The IRS seeks summary judgment in its favor on these three counts.   It raises several arguments in support.   First, the IRS contends that a Ponzi scheme is by definition not a trade or business within the meaning of 26 U.S.C. § 162 and, thus, no expenses TelexFree incurred in operating the Ponzi scheme are deductible.   Second, assuming I do not agree that TelexFree is ineligible to deduct expenses, the IRS argues that the deductions TelexFree took based on its obligations to pay Participants are not deductible because the trustee has not shown they were reasonable, ordinary and necessary expenses.   Third, assuming I reject the IRS's first two arguments, the IRS asks me to limit the deductions to the amount of credits that Participants actually exchanged for cash from TelexFree.

The IRS also seeks summary judgment regarding other deductions taken by TelexFree. First, the IRS contends that TelexFree did not have a bona fide debtor-creditor relationship with Ympactus, its Brazilian affiliate, and, therefore, TelexFree was not entitled under 26 U.S.C. § 166(a) to take a deduction in its 2013 tax return for writing off as a bad debt the amounts Ympactus owed to TelexFree.   The IRS also claims that TelexFree was not entitled to take a casualty loss deduction under 26 U.S.C. § 165 in its 2014 return resulting from the forfeiture of assets by James Merrill, one of TelexFree's principals, as part of his criminal sentence.

A.     *Deductions by Ponzi Scheme Perpetrators*

The IRS maintains that as a matter of law a Ponzi scheme perpetrator such as TelexFree cannot claim tax deductions under 26 U.S.C. § 162(a).   That section provides, in pertinent part:

**(a) In general**

There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; and

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

26 U.S.C. § 162(a).   "[F]or a taxpayer 'to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit.'"   *Campbell v. Comm'r*, T.C. Memo 2001-51, 2001 Tax Ct. Memo LEXIS 67 (2001) (alteration in original) (quoting *Groetzinger v. Comm'r*, 480 U.S. 23, 35 (1987)).

The IRS argues that a Ponzi scheme is not a "trade or business" entitled to take deductions under 26 U.S.C. 162(a) because it is not operated for the primary purpose of generating a profit: "Ponzi schemes like TelexFree do not meet the test because, by definition, they cannot result in a profit and, indeed, their principals have no intention for the Ponzi scheme to make a profit." Def.'s Second Mot. Partial Summ. J. Br. 5, ECF No. 55-1.[7]   The IRS further avers that a corporate taxpayer like TelexFree should be evaluated under the "trade or business" analysis based on whether it is motivated to generate profit, not income.

---

[7] While arguing that as a matter of law Ponzi schemes are not entitled to take any deductions, it is the IRS's unequivocal position that every penny a Ponzi scheme earns (or that any other illegal activity earns, for that matter) is subject to income tax.

The IRS has presented no legal authority that, as a matter of law, a Ponzi scheme cannot constitute a "trade or business" under the Internal Revenue Code.   On the contrary, as the IRS concedes, *id.* at 7, taxpayers conducting illegal business activity can operate a "trade or business" entitling them to take deductions under § 162(a) of the Internal Revenue Code.   *See, e.g.*, *Comm'r v. Sullivan*, 356 U.S. 27, 29 (1958) ("[T]he 'fact that an expenditure bears a remote relation to an illegal act' does not make it nondeductible." (quoting *Comm'r v. Heininger*, 320 U.S. 467, 474 (1943))); *Comm'r v. Groetzinger*, 480 U.S. 23, 35-36 (1987) (holding that taxpayer's illegal gambling was a business).   There is no dispute that TelexFree generated some income from the sale of VoIP telephone subscription packages.   Further, the current record does not support a finding that TelexFree's principals at all times lacked the intent to operate a business and generate profits therefrom.   In fact, in 2012 TelexFree reported a profit and paid over $885,000 in taxes and penalties.   As material factual questions remain as to, for example, TelexFree's primary purpose for engaging in its activity, a trial will be necessary to establish whether TelexFree was a "trade or business" entitled to deduct expenses.

B.     *Deductions for Credits*

The IRS contends that, because the obligations incurred by TelexFree to redeem credits earned by Participants for recruiting new Participants and posting internet advertisements were not reasonable, they were not deductible as ordinary and necessary expenses under 26 U.S.C. § 162(a).

For an expense to be ordinary, it must arise from a transaction that is "of common or frequent occurrence in the type of business involved."   *Lilly v. Comm'r*, 343 U.S. 90, 93 (1952). For an expense to be necessary, it must be appropriate and helpful to the business.   *See Welch v. Helvering*, 290 U.S. 111, 113 (1933).   Whether an expenditure is "ordinary and necessary" for purposes of deductibility is generally a question of fact.   *See, e.g.*, *Comm'r v. Heininger*, 320 U.S.

26

at 474-75.   But the IRS argues that no deduction may be considered ordinary and necessary unless it is reasonable.

The IRS relies on two decisions to support its overlaying a reasonableness gloss on 26 U.S.C. § 162(a).   In the first, the U.S. Court of Appeals for the Sixth Circuit held that "the element of reasonableness is inherent in the phrase 'ordinary and necessary.'"   *Comm'r v. Lincoln Elec. Co.*, 176 F.2d 815, 817 (6th Cir. 1949).   *Lincoln Electric*, however, involved an earlier version of the Internal Revenue Code in which the relevant language was part of a single narrative paragraph, a fair reading of which could support the conclusion that a reasonableness standard applied to the entirety of the statutory provision.[8]   The current version of § 162(a) (see above) is structured differently with enumerated subparts making it clear that reasonableness is not a general prerequisite.   The statute now provides that certain specified expenses in a non-exclusive list must be reasonable (for example, a "reasonable" allowance for salaries or other compensation for personal services actually rendered (26 U.S.C. § 162(a)(1)); and travel expenses which are not "lavish or extravagant" (26 U.S.C. § 162(a)(2)).   The time-honored principle of statutory

---

[8] When *Lincoln Electric* was decided, § 23 of the Internal Revenue Code ("Deductions from gross income") provided:

In computing net income there shall be allowed as deductions:

(a)   Expenses.

(1)   Trade or business expenses.

(A)   In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

26 U.S.C. § 23 (1946).

construction, *expressio unius est exclusio alterius*—which is "[a] canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative" (*Expressio unius est exclusio alterius*, Black's Law Dictionary (10th ed. 2014))—demands the conclusion that only certain expenses identified by the statue, including salaries and travel costs, must be reasonable to be deductible, while other enumerated expenses (such as rent) and expenses in general need only be ordinary and necessary.

The IRS also cites a decision from our district court, *In re Receivership Estate of Indian Motorcycle Mfg., Inc.*, 299 B.R. 8 (D. Mass. 2003), in support of its view of what qualifies as an ordinary and necessary business expense. That decision, however, stands, not for the conclusion that all ordinary and necessary expenses must be reasonable to be deductible, but for the unremarkable proposition that "[i]n general, expenditures made on behalf of another's business are not ordinary and necessary expenses of the taxpayer's business." *Id*. at 27.

As a fallback argument, in the event its reasonableness gloss is rejected, the IRS maintains that only cash outlays by TelexFree to Participants, as opposed to accrued but not paid credits, may be considered ordinary and necessary business expenses. This argument is based on the application of the so-called "all events test" to accrual-method taxpayers like TelexFree. *See* 26 U.S.C. § 461(h); *see also*, *e.g.*, *Interex, Inc. v. Comm'r*, 321 F.3d 55, 58 (1st Cir. 2003) ("Accrual method taxpayers may deduct expenses when they are incurred even if they have not yet been paid, as long as three factors are met: 1) all of the events that establish the fact of the liability must have occurred; 2) the amount must be able to be determined 'with reasonable accuracy'; and 3) economic performance must have occurred. Treas. Reg. § 1.461-1(a)(2)(i); *see also id.* § 1.461-4 (explaining economic performance)."). The IRS concedes that it has presented no legal authority to support its argument that the "all events test" can be applied in the manner it advocates

in this case, where TelexFree issued credits to Participants who could convert those credits into cash at any moment at their option.   If the IRS chooses to proceed under this argument, it will be necessary to establish at trial whether TelexFree qualified under the all events test to deduct Participants' credits.

To summarize, the IRS has not establish as a matter of law that 26 U.S.C. § 162(a) requires that all ordinary and necessary business expenses of TelexFree must also have been reasonable or that only TelexFree's cash outlays to Participants can constitute ordinary and necessary business expenses under the all-events test.   Therefore, I conclude that the IRS's motion for summary judgment on counts 1, 2, and 3 must be denied.

C.      *The Ympactus Bad Debt Deduction*

The Internal Revenue Code allows a taxpayer to deduct a business debt that becomes worthless within a taxable year.   26 U.S.C. § 166(a)(1); *Seiffert v. Comm'r*, T.C. Memo 2014-4, 2014 Tax Ct. Memo LEXIS 5, at *10 (T.C. 2014).   Business debts are debts "created or acquired (as the case may be) in connection with a trade or business of the taxpayer," or debts "the loss from the worthlessness of which [are] incurred in the taxpayer's trade or business."   *See* 26 U.S.C. § 166(d)(2).   TelexFree claimed a bad debt deduction on its 2013 Original Return (and its 2013 Amended Return) associated with a receivable from Ympactus, an entity sharing common ownership with TelexFree, that operated the Brazilian arm of the TelexFree scheme.

The IRS contends that TelexFree could not claim the Ympactus bad debt deduction for two reasons.   First, because TelexFree did not operate a trade or business, it cannot claim a deduction for a bad debt.   This argument fails for the reasons already discussed.   A trial will be necessary to determine whether TelexFree qualified as a trade or business for purposes of eligibility to deduct expenses.

The second reason is that the Ympactus bad debt was not a "bona fide debt" under the pertinent federal regulation, which provides: "Only a bona fide debt qualifies for purposes of [26 U.S.C. § 166]. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." 26 C.F.R. § 1.166-1(c). The IRS argues that TelexFree did not have a bona fide debtor-creditor relationship with Ympactus, and, therefore, TelexFree could not take a business bad debt deduction on its 2013 Original Return. Whether a bona fide debt exists is assessed based upon the facts and circumstances surrounding the debt.

> Determining whether the transactions here qualify under [26 C.F.R. § 1.166-1(c)] necessitates consideration of "a number of different factors." *Casco Bank & Trust Co. v. United States*, 544 F.2d 528, 532 (1st Cir. 1976), *cert. denied*, 430 U.S. 907, 97 S. Ct. 1176, 51 L.Ed. 2d 582 (1977). The many relevant criteria enumerated in the case law, *see, e.g.*, *id.*; *In re Uneco, Inc.*, 532 F.2d 1204, 1208 (8th Cir. 1976); *Smith v. Commissioner*, 370 F.2d 178, 180 (6th Cir. 1966), fall roughly into three categories: (1) the intent of the parties; (2) the form of the instruments; and (3) the objective economic reality. *Fischer v. United States*, 441 F.Supp. 32, 36 (E.D.Pa.1977), *aff'd mem.*, 582 F.2d 1274 (3d Cir.1978).

*K & R Service Co. v. United States*, 568 F. Supp. 38, 41-42 (D. Mass 1983).

The IRS contends that TelexFree failed to substantiate the existence of its receivable from Ympactus, stating that

> [t]he trustee has not produced evidence of any sale that produced an account receivable that was previously reported on a tax return as income; evidence of a loan by TelexFree, LLC, to Ympactus; evidence of security or collateral granted by Ympactus to TelexFree, LLC; or evidence of a set repayment schedule with interest, or of payments of principal or interest being made on that schedule.

Def.'s Second Mot. Partial Summ. J. Br. 16, ECF No. 55-1.

The trustee responds that TelexFree "reported the Ympactus income on its tax returns, and the account receivable due from Ympactus to TelexFree became uncollectible when the Brazilian governments seized the assets of Ympactus." Pl.'s Resp. 17, ECF No. 65. At oral argument, the trustee clarified that the money owed by Ympactus for this receivable derived from management

fees, accounting fees, data processing fees, and other services rendered by TelexFree—not from a loan. The trustee contends that a taxpayer may take a business deduction for the write-off of a debt as uncollectible under 26 C.F.R. § 1.166-1(c) if the income pertaining to that debt was included in the taxpayer's taxable income in the same or a prior tax year. Pl.'s Resp. 17-18. The trustee further notes that Ympactus was shut down and its assets seized in 2013 and argues that "[t]he cessation of an account debtor's business is sufficient to substantiate that the debt is uncollectible." *Id.* at 18 (citing *Delk v. Comm'r*, 113 F.3d 984, 986 (9th Cir. 1997)).

I find that a genuine issue of material fact exists as to whether the Ympactus account receivable was a bona fide debt that TelexFree could deduct under 28 U.S.C. § 166. As a result, the IRS's motion for summary judgment on this issue will be denied.

D.   *Casualty Loss Deduction for Criminal Forfeiture by Principal*

A taxpayer may deduct certain casualty losses. 26 U.S.C. § 165(a) ("There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."). In the 2014 Amended Return, TelexFree claimed a casualty loss deduction for the 2014 tax year as a result of the forfeiture of assets by one of its principals as part of his criminal sentence. The IRS maintains that TelexFree was not entitled to claim this deduction. But I need not reach this substantive issue because TelexFree did not claim this deduction on the 2014 Original Return, which is the return relevant to count 3 of the complaint.

Count 3 alleges the following, in pertinent part:

63.   By reason of the foregoing, TelexFree Credits, bad debts and other expenses are allowable expense deductions resulting in no taxable income for the years 2012, 2013, and [2]014.

64.   The Administrative Claim and the Prepetition Claim are premised upon an erroneous assertion of taxable income and penalties and interest thereon. Accordingly, the Claims should be disallowed.

Compl. ¶¶ 63-64, ECF No. 1.[9]

Thus, whether TelexFree could claim the 2014 casualty loss deduction is not properly before

the Court.    The complaint seeks a declaratory judgment in count 3 that the Administrative Claim—

the only claim concerning TelexFree's 2014 tax liability—should be disallowed.      The

Administrative Claim was filed based on the NOPA stemming from the 2014 Original Return, which

did not claim a casualty loss deduction.    The IRS filed the Administrative Claim before the trustee

filed the 2014 Amended Return containing the casualty loss deduction.    Therefore, the IRS's

Administrative Claim is not based in any respect on whether the trustee is entitled to a casualty loss

deduction.    In other words, whether TelexFree is entitled to claim the casualty loss deduction has

no bearing on whether the IRS's Administrative Claim should be allowed.    I will not issue an

advisory opinion on this issue.  *See Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003)

(discussing ripeness, including constitutional prohibition against advisory opinions).    The IRS's

motion for summary judgment regarding the deductibility of the 2014 casualty loss will be denied.

4.    *The IRS's Counterclaim*

Through its counterclaim, the IRS seeks to "recover" the 2013 Refund under 26 U.S.C.

§ 7405(b).    Def.'s Answer & Countercl. ¶ 74, ECF No. 4.    In the counterclaim's prayer for relief,

the IRS asks for (a) a "[j]udgment allowing the IRS's proof of claim under 11 U.S.C. § 502 in the

---

[9] The Complaint defines the "TelexFree Credits" as a combination of credits that Participants
could earn (a) for posting ads on the internet and (b) in exchange for recruiting new Participants
into the TelexFree scheme.    Compl. ¶ 24.    The Complaint defines the Administrative Claim to
be Claim No. 2987-2 asserting an administrative claim related to, *inter alia*, taxes due for the
2014 tax year.    Compl. ¶ 42.    The Complaint defines the Prepetition Claim to be Claim No.
3456 asserting a prepetition priority unsecured claim of $285,710,295 and a prepetition non-
priority unsecured claim of $71,188,567 based on the IRS's 2013 NOPAs stemming from the
2013 Original Return.    Compl. ¶ 37.    But, in the parties' statements of undisputed facts related
to the IRS's motion and the trustee's response thereto, Claim No. 3456 is re-labeled as Claim
No. 2988-1.    *See* Def.'s Statement ¶ 49, ECF No. 54; Pl.'s Statement ¶ 49, ECF No. 67.

amount of $356,898,861.36, as filed;" (b) a "[j]udgment allowing the IRS's request for payment

of administrative expenses in the amount of $69,460,404.39, as filed;" (c) a "[j]udgment

disallowing any turnover requests, and to the extent they have been made, any claims for refunds,

of the Trustee;" and (d) a judgment in favor of the IRS against the TelexFree estate "in the amount

of $15,532,440.39, plus statutory additions including interest from and after" issuance of the 2013

Refund.  *Id.* at 23-24.   In its second motion for partial summary judgment, the IRS asks for relief

on the counterclaim as follows:

> The Court thus should grant summary judgment in favor of the United States on
> Counts II and III of the Complaint and on the United States' Counterclaim by
> allowing the IRS's proof of claim and its request for payment of administrative
> expenses as filed, denying any turnover requests or claims for refund made by the
> Trustee, and entering a money judgment in favor of the United States and against
> the Trustee in the amount of $15,532,440.39, plus statutory additions including
> interest from and after December 26, 2016, for the erroneous refund that was issued
> to the Trustee related to TelexFree, LLC's federal income taxes for the tax year
> 2013.

Def.'s Second Mot. Partial Summ. J. Br. 22, ECF No. 55-1.

I have ruled above that the trustee is entitled to a declaratory judgment on count 4

("Declaratory Judgment as to Priority of Claim for 2013 Refund") because the IRS has no right to

an administrative expense claim for recovery of the 2013 Refund and, instead, has a prepetition

priority claim for the 2013 tax year under § 507(a)(8)(A)(i) based on an erroneous refund as

provided in § 507(c).   Accordingly, the IRS's request for a money judgment related to its

counterclaim will be denied.   In addition, I have ruled that the IRS is not entitled to summary

judgment on counts 1, 2, or 3 based on the arguments in its second motion for partial summary

judgment.   Therefore, the IRS's corresponding request for summary judgment on its counterclaim

that it is entitled to a money judgment, that its claims are deemed allowed, that it is deemed to hold

administrative claims, and that the trustee's turnover requests or claims for a refund should be

rejected, will be denied.

5.    *The Trustee's Request for Relief Under Federal Rule of Civil Procedure 56(f)*

The trustee did not file a motion for summary judgment with respect to counts 1, 2, 3 or the counterclaim.   Instead, in his opposition to the IRS's second motion for partial summary judgment, the trustee seeks relief under Rule 56(f)(1) of the Federal Rules of Civil Procedure, which provides that a court has discretion to grant summary judgment to a nonmovant after giving notice and a reasonable time to respond.   Fed. R. Civ. P. 56(f); *Mackey v. Town of Tewksbury*, No. 15-12173-MBB, 2020 U.S. Dist. LEXIS 2139, at *79 (D. Mass. Jan. 7, 2020).   Upon consideration of the record and the parties' arguments, as well as the rulings made herein, I conclude that issues of fact remain for trial with respect to counts 1, 2, 3 and the counterclaim and, therefore, will deny the trustee's Rule 56(f)(1) request.

Separate orders consistent with this memorandum shall issue.

At Boston, Massachusetts this 26th day of March, 2020.

By the Court,

_____
Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:    Andrew G. Lizotte, Esq.
Harold B. Murphy, Esq.
Charles R. Bennett Jr., Esq.
Murphy & King, Professional Corporation
Boston, MA
for the plaintiff, Stephen Darr,
Trustee of the Estates of TelexFree, LLC, TelexFree, Inc., and
TelexFree Financial, Inc.

Lauren Hume, Esq.
U.S. Department of Justice, Tax Division
Washington, DC
for the defendant, Internal Revenue Service